1  Marika K. O'Connor Grant, SBN 334469
2  moconnorgrant@bm.net
   **BERGER MONTAGUE PC**
3  1229 Tyler Street NE, Suite 205
   Minneapolis, MN 55413
4  Tel : (612) 594-5999
5  Fax : (612) 584-4470

6  *Counsel for Plaintiff*
7  *(additional counsel listed on signature page)*

8          **UNITED STATES DISTRICT COURT**
9        **SOUTHERN DISTRICT OF CALIFORNIA**

10
|  | |
|---|---|
| KENNETH FISHER, on behalf of himself and all others similarly situated, | Case No. **'25CV1698 WQHDEB** |
| Plaintiff, | *Civil Rule 3.1 Designation: (o.) consumer class action* |
| v. | **CLASS ACTION COMPLAINT** |
| ERIC WELCH; JAY MCGRAW; CREDITSERVE, INC.; SHANE THIN ELK; PETER LENGKEEK; RORY-ANNE ZIEGLER; SUMMER DRAPEAU; CHRISTINE OBAGO; MARK WELLS; FABIAN HOWE, SR.; KYLE LOUDNER; and JOHN DOES 1 - 40, | (I), (II) Violations of RICO, 18 U.S.C. § 1962, *et seq*.; (III) Violations of California's Usury Law; (IV) Violations of Cal. Bus. & Prof. Code § 17200; (V) Unjust Enrichment; (VI) Civil Conspiracy; (VII) Declaratory Judgment; (VIII) Injunctive Relief |
| Defendants. | **DEMAND FOR JURY TRIAL** |

24       Plaintiff Kenneth Fisher ("Plaintiff"), on behalf of himself and all individuals
25 similarly situated, by counsel, brings this class action to secure redress from
26 predatory and unlawful loans made by: (i) Defendants Eric Welch ("Welch"), Jay
27 McGraw ("McGraw"), and CreditServe, Inc. ("CreditServe") (collectively, the

"CreditServe Defendants"); (ii) Defendant Shane Thin Elk ("Thin Elk," together with the CreditServe Defendants, the "Non-Tribal Defendants"); (iii) Defendants Peter Lengkeek, Rory-Anne Ziegler, Summer Drapeau, Christine Obago, Mark Wells, Fabian Howe, Sr., and Kyle Loudner (collectively, the "Tribal Defendants"); and (iv) John Does, 1-40 (when together with the Non-Tribal Defendants and the Tribal Defendants, "Defendants").

## GENERAL ALLEGATIONS

1. For a consumer who has bad credit or no credit, a high-interest, short-term loan—which can hit the consumer's bank account almost immediately, without the need for a traditional credit check— can seem like their only option to finance an unexpected expense, like a broken-down car or medical emergency. And this is precisely why the lenders behind these loans can get away with charging eye-popping interest rates: the lenders know that their target borrowers need money, now, no matter the long-term cost.

2. As it turns out, that cost is often devastating. When a consumer takes out a high-interest loan, they end up paying back many times more than what they borrowed. Worse yet, once saddled with such a predatory loan, the borrower is often forced to take out another high-interest loan—and another, and another—to make ends meet and pay off their debts. This creates a cycle of mounting debt for the consumer. High-interest, short-term loans also create a cycle of mounting profits for the predatory lenders who make them.

3. To both protect consumers from the vicious cycle of high-interest loans, and to deter lenders from issuing these harmful loans, most states have enacted usury laws to limit the amount of interest a lender can charge on a loan. Forty-five states and the District of Columbia cap annual percentage rates ("APR") for $500 installment loans, with a median rate of 38.5%. For $2,000 installment

loans, 43 states and the District of Columbia cap APRs, with a median rate of 32.5%.[1]

4.    Unfortunately, because there is so much money to be made off usurious loans, state and federal usury laws have done little to thwart certain predatory and creative lenders.

5.    This is a case about a group of clever lenders and their scheme to circumvent usury laws in order to make online, short-term, small-dollar loans that carry interest rates exceeding **700**%—loans that are patently illegal in most states. This scheme not only takes advantage of vulnerable consumers, but it also exploits Native American tribes.

6.    To explain, and as alleged in greater detail herein, the Non-Tribal Defendants have convinced the Tribal Defendants to let them use the Crow Creek Sioux Tribe's (the "Tribe") name as a "front" for numerous predatory lending enterprises, including one that operates under the name Wahido Lending d/b/a River Valley Loans ("River Valley Loans" or "RVL"). With the Tribe serving as the face of the scheme, the Non-Tribal Defendants have attempted to cloak themselves in the Tribe's sovereign immunity, thereby (supposedly) placing them beyond the reach of usury laws.

7.    On its website, River Valley Loans purports to be a tribal lending business that is owned by Dakota Economic Development Corporation ("DEDC"), which is "a sovereign economic arm, enterprise, and instrumentality of, and created under the laws of and for the benefit of, the Crow Creek Sioux Tribe."[2]

8.    But, in reality, the Tribe has virtually nothing to do with the operation

---

[1] National Consumer Law Center, *State Rate Caps for $500 and $2,000 Loans*, https://www.nclc.org/resources/state-rate-caps-for-500-2000-loans/ (last visited June 24, 2025).

[2] River Valley Loans, https://rivervalleyloans.com/ (last visited June 24, 2025).

of the lending business. The Tribe's control over the RVL lending enterprise is nothing more than a façade: it is the Non-Tribal Defendants (and other non-tribal schemers) that provide the infrastructure to market, underwrite, service, fund, and collect the loans. It is also the Non-Tribal Defendants that primarily profit from these loans, with only a small portion of the illegal revenues generated flowing to the Tribe.

9.     The Non-Tribal Defendants may be creative, but they are not above the law.

10.     Indeed, courts routinely reject such cynical efforts to use tribal immunity to insulate plainly illegal commercial conduct. The Non-Tribal Defendants' predatory and illegal lending scheme cannot be shielded by the laundered sovereign immunity of the Tribe.

11.     Plaintiff, on behalf of himself and the Classes set forth below, seeks to recover damages and penalties under state and federal law for the usurious interest and fees obtained by the Non-Tribal Defendants, and also seeks injunctive and declaratory relief against the Tribal Defendants to halt their illegal practices.

## JURISDICTION AND VENUE

12.     This Court has original jurisdiction over Plaintiff's Racketeer Influenced and Corrupt Organizations ("RICO") claims under 18 U.S.C. § 1962, and 28 U.S.C. § 1331, and supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

13.     This Court also has jurisdiction under the Class Action Fairness Act because Plaintiff and at least one Defendant are citizens of different states and the matter in controversy exceeds $5,000,000, and there are at least 100 members of each Class.

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claims occurred in San

1  Diego, California, including in this District and Division. Additionally, venue is

2  proper in this Court pursuant to 18 U.S.C. § 1965(a) because Defendants transacted

3  their affairs in this District and Division.

4  ## THE PARTIES

5      15.    Plaintiff Kenneth Fisher is a natural person, citizen of the State of

6  California, and resident of San Diego, California.

7      16.    Defendant Eric Welch is a natural person and citizen of the State of

8  Texas. Welch is the Chief Executive Officer, Secretary, and Chief Financial Officer

9  of CreditServe, Inc. Welch is not a member of the Tribe.

10      17.    Defendant Jay McGraw is a natural person and citizen of the State of

11  Texas. McGraw previously served as the President of CreditServe. Discovery will

12  show that McGraw provides the capital used to fund loans nominally made by River

13  Valley Loans.

14      18.    Defendant CreditServe, Inc. is a corporation organized under the laws

15  of California, with offices at 137 N. Larchmont Blvd., #705, Los Angeles,

16  California 90004 and 1421 Wells Branch Pkwy., Pflugerville, Texas 78660.

17      19.    Defendant Shane Thin Elk is a natural person and citizen of the State

18  of Wisconsin. Thin Elk is not a member of the Tribe.

19      20.    Defendant Peter Lengkeek is a tribal member and Chairman of both

20  the DEDC and the Tribe. He is being sued in his official capacity only.

21      21.    Defendant Rory-Anne Ziegler is a tribal member and Vice-Chair of

22  both the DEDC and the Tribe. She is being sued in her official capacity only.

23      22.    Defendant Summer Drapeau is a tribal member and Secretary of both

24  the DEDC and the Tribe. She is being sued in her official capacity only.

25      23.    Defendant Christine Obago is a tribal member and Treasurer of both

26  the DEDC and the Tribe. She is being sued in her official capacity only.

27      24.    Defendants Mark Wells, Fabian Howe, Sr., and Kyle Loudner are each

1  a tribal member and Councilmember of both the DEDC and the Tribe. They are
2  each being sued in their official capacity only.

3      25.    Defendant John Doe Nos. 1-40 are unidentified parties who
4  participated in the enterprise with the Defendants, including, but not limited to,
5  individuals and entities who aided, abetted, and facilitated the conspiracy to collect
6  the unlawful amounts from consumers.

7                          **FACTUAL ALLEGATIONS**

8  **A.    The Emergence of the Tribal Lending Scheme**

9      26.    Predatory lenders have long searched for clever ways to evade usury
10 laws. In the latest scheme, a non-tribal lender affiliates with a Native American
11 tribe. The latter serves as the face of the online lending enterprise—in exchange for
12 a small portion of the revenues generated—while the former actually calls all of the
13 shots, controlling all substantive aspects of the business such as funding, marketing,
14 loan origination, underwriting, loan servicing, electronic funds transfers, and
15 collections.

16     27.    The purpose of the scheme is clear: non-tribal schemers "use tribal
17 immunity as a shield for conduct of questionable legality." *Michigan v. Bay Mills*
18 *Indian Cmty.*, 134 S. Ct. 2024, 2052 (2014) (Scalia, J., dissenting) (citing Nathalie
19 Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are*
20 *Both Tribal Sovereignty and Consumer Protection at Risk?* 69 Wash. & Lee L. Rev.
21 751, 758–759, 777 (2012)).

22     28.    In other words, because the tribe authorizes the lending operation, the
23 tribe's sovereign legal status and general immunity from suit under federal and state
24 laws protect the operation, insulating its loans from state and federal usury laws. As
25 a result, the non-tribal schemers orchestrating the enterprise—who would normally
26 be subject to usury laws limiting APRs in the low double digits—can issue loans to
27 consumers with triple-digit interest rates.

**CLASS ACTION COMPLAINT - 6**

29.    Tribal lending schemes do not promote tribal businesses or prosperity. Rather, they are contrivances aimed at avoiding state usury laws, with non-tribal entities receiving the vast majority of the businesses' revenue, and the tribes typically receiving only a small share.

30.    And, as with all predatory loans, they also exploit vulnerable borrowers. As Darrel Frank, the former chief of the tribe behind one tribal lending enterprise, Minto Money, explained, his tribe's enterprise "[i]s bringing in a lot of money. But it's off the misery of the people on the other end who are taking out these loans."[3]

31.    In recent years, these nefarious schemes have come under increased scrutiny.

32.    Perhaps most notably, in October 2017, one prominent perpetrator of a tribal lending scheme, Scott Tucker, was convicted of numerous federal racketeering and truth-in-lending offenses.[4] He was sentenced to 200 months, or more than 16 years, in prison.[5] His attorney was also convicted and sentenced to 84 months in prison for his role in perpetrating the illegal lending scheme.[6]

33.    In addition, the Consumer Financial Protection Bureau ("CFPB"),[7]

---

[3] ProPublica, *A 700% APR Lending Business Tied to Dr. Phil's Son Is Dividing an Alaska Tribe*, https://www.propublica.org/article/minto-money-dr-phil-son-payday-lending-alaska (last visited June 24, 2025).

[4] *See* The United States Attorney's Office, Southern District of New York, *Scott Tucker Sentenced To More than 16 Years In Prison For Running $3.5 Billion Unlawful Internet Payday Lending Enterprise*, https://www.justice.gov/usao-sdny/pr/scott-tucker-sentenced-more-16-years-prison-running-35-billion-unlawful-internet-payday (last visited June 24, 2025).

[5] *Id.*

[6] *Id.*

[7] Consumer Financial Protection Bureau, *CFPB Sues Four Online Lenders for Collecting on Debts Consumers Did Not Legally Owe*, https://www.consumerfinance.gov/about-us/newsroom/cfpb-sues-four-online-

attorneys general,[8] and consumers[9] have filed numerous complaints against online lenders for running illegal tribal lending schemes. Several class actions and government enforcement actions have returned hundreds of millions of dollars to consumers victimized by tribal lending operations, and canceled billions of dollars in outstanding debt.

34.   Unfortunately, however, the threat of litigation and federal enforcement has not stopped all predatory lenders from continuing to use this tribal lending model. Instead, many of these schemers have just gotten better at concealing their involvement.

## B.   The CreditServe Defendants Have Deep Ties to Predatory Lending Schemes

35.   The CreditServe Defendants are no strangers to predatory lending. Indeed, for well over a decade, Welch and McGraw have been partners in a variety of businesses aimed at profiting off of vulnerable borrowers.

36.   McGraw, a TV producer and son of "Dr. Phil," became involved in the payday lending industry over a decade ago.[10] Welch is McGraw's longtime business partner, and describes himself as a "[d]ynamic and results-driven Executive with 25+ years of operations experience in the financial services and restaurant

---

lenders-collecting-debts-consumers-did-not-legally-owe/ (last visited June 24, 2025).

[8] *See, e.g.*, The Office of Minnesota Attorney General Keith Ellison, *AG Ellison sues to stop predatory internet lending in Minnesota*, https://www.ag.state.mn.us/Office/Communications/2023/11/01_IslandMountain.asp (last visited June 24, 2025).

[9] *See, e.g.*, Top Class Actions, *Historic $1.5B settlement seeks payday loan forgiveness, other relief*, https://topclassactions.com/lawsuit-settlements/money/loans/historic-1-5b-settlement-seeks-payday-loan-forgiveness-other-relief/ (last visited June 24, 2025).

[10] ProPublica, *supra* n.3.

1    industries."[11] He is also on the board of directors of the Online Lenders Alliance, a

2    lobbyist for high-interest lenders and their monied interests.

3    37.    In the 2010s, Welch and McGraw briefly teamed up to offer payday

4    loans online at CashCash.com, via a corporation called Helping Hand Financial,

5    Inc. In 2013, filings with the State of California named McGraw as the President

6    and Secretary of the company, which had previously been called "Cadillac Tequila,

7    Inc." By July 2017, Welch had joined as the company's Director. In December

8    2017, both Welch and McGraw signed the company's certificate of dissolution.

9    38.    Welch and McGraw are also named on corporation papers for Cherry

10   Auto Finance Inc., formed in 2021, "which offers easy financing for used cars

11   online at cherrycars.com, appealing to subprime borrowers."[12]

12   39.    In addition, Welch and McGraw have consistently served at the helm

13   of their most enduring company: CreditServe.

14   40.    In 2013, Welch became president of MBC Financial, Inc., which, in

15   2014, had its name changed to CreditServe, Inc. Also in 2014, McGraw was listed

16   as the company's President and Secretary. According to his LinkedIn, Welch has

17   been serving as the Chief Executive Officer of CreditServe since March 2017.[13]

18   Filings with the State of California in both 2022 and 2025 identify Welch as the

19   company's Chief Executive Officer, Secretary, and Chief Financial Officer.

20   41.    As of 2018, the CreditServe Defendants readily admitted that

21   CreditServe was a "consumer loan servicing company" and that it "manage[s]" its

---

[11] LinkedIn, *Eric W.*, https://www.linkedin.com/in/ericgwelch/ (last visited June 24, 2025).
[12] ProPublica, *supra* n.3.
[13] LinkedIn, *supra* n.11.

customers' loans.[14] They also touted that they could "think outside the box to provide innovative, modern solutions" because they had "over 15 years in consumer short-term lending."[15]

42.     However, this language has since been scrubbed from the CreditServe website. The CreditServe Defendants now simply claim that CreditServe is a "management consulting company" and that they are "able to think outside of the box and provide solutions that will last" because they have "extensive knowledge in a variety of subjects."[16]

## C.     The CreditServe Defendants Still Manage Consumer Loans from Start to Finish

43.     Despite the changes that the CreditServe Defendants might have made to the CreditServe website, the nature of their work remains unchanged. As the LinkedIn profiles of numerous CreditServe employees (including Welch himself) illustrate, the CreditServe Defendants manage their customers' loans, from acquisition to collections.

44.     **Lead Acquisition.** One current CreditServe employee, the "Chief Credit Officer," touts that he "[l]ead[s] and grow[s] a department focused on Credit Risk Management, Model Development, Underwriting Strategy, Lead Acquisition, Portfolio Management, Fraud Management, and Analytics," and, in a previous role with the company, "[m]anaged a team of data scientists and analysts focused on forecasting, custom score development, and portfolio analysis."[17]

---

[14] CreditServe (digital archive from Wayback Machine, dated Nov. 23, 2018), https://web.archive.org/web/20181123150413/https:/crserve.com/ (last visited June 24, 2025).

[15] *Id.*

[16] CreditServe, https://crserve.com/ (last visited June 24, 2025).

[17] LinkedIn, *Jeremy Jones*, https://www.linkedin.com/in/jerdonjones/ (last visited June 24, 2025).

45.    **Loan Underwriting, Approval, and Origination.** Welch himself boasts that CreditServe provides "best in class underwriting & decisioning" to its FinTech customers.[18] Another current CreditServe employee, a "Communications Supervisor," states that, among other things, she: "[h]andle[s] administrative tasks throughout the day, including originating loans and completing supervisor-level processes submitted by agents via email" and "[r]eview[s] loans for accuracy before originating and verify details for revoke requests to maintain precision."[19] In addition, a "Call Center Supervisor/Trainer" who left the company in November 2022 states that his job responsibilities included "finaliz[ing] loans for customers" and "[r]eveiw[ing] and [a]pprov[ing] [l]oans based on customer qualifications."[20] And a former "Data Scientist" who left CreditServe in April 2024, among other things, was "[r]esponsible for the design, buildout, automation, and maintenance of…[a]pplicant conversion and profitability scoring."[21]

46.    **Collections.** Another current CreditServe employee lists her title as a "Debt Collector Specialist."[22] And a "Collections Specialist" who worked at the company until July 2024 reveals that, during his employment, he was one of 14 individuals working in collections.[23]

47.    **Customer Support.** The aforementioned Communications Supervisor admits that she "[s]upervise[s] a team of customer service representatives handling

---

[18] LinkedIn, *supra* n.11.

[19] LinkedIn, *Monica Mendiola*, https://www.linkedin.com/in/monicamendiola/ (last visited June 24, 2025).

[20] LinkedIn, *Warren J.*, https://www.linkedin.com/in/warren-j-72a1a8b0/ (last visited June 24, 2025).

[21] LinkedIn, *Adam D. Cazes*, https://www.linkedin.com/in/adamcazes/ (last visited June 24, 2025).

[22] LinkedIn, *Isabel V.*, https://www.linkedin.com/in/vegalisa/ (last visited June 24, 2025).

[23] LinkedIn, *Daniel Carr*, https://www.linkedin.com/in/daniel-carr-6642a3104/ (last visited June 24, 2025).

live chat support, customer service emails, and SMS communications across six loan portfolios."[24] In addition, CreditServe was recently accepting applications for a "Customer Service Representative," who "will play a crucial role in authenticating information provided for the purposes of funding consumer, short-term personal loans." Ex. A.

48.    **Operational Support.** Lastly, Welch describes CreditServe as providing "day-to-day operational support," as well as marketing and compliance services, to its clients.[25]

## D.    The CreditServe Defendants Have Ties to Tribal Lending Schemes, in Particular

49.    It is perhaps unsurprising that Welch and McGraw, veterans in the predatory lending industry, have made their way into the tribal lending business, as well. No doubt due to the threat of litigation and federal enforcement, the two businessmen have gone to great lengths to cover their tracks into tribal schemes. But, footprints remain.

50.    As of 2018, the CreditServe website boasted a "testimonial" from "LDF Holdings."[26] This is the same LDF Holdings that is associated with the Lac de Flambeau Band of Lake Superior Chippewa Indians, and which recently reached a $37.4 million settlement as part of a class action lawsuit over a predatory lending scheme involving triple-digit interest rates.[27] The settlement also included the

---

[24] LinkedIn, *supra* n.19.

[25] LinkedIn, *supra* n.11.

[26] CreditServe, *Testimonials* (digital archive from Wayback Machine, dated March 14,                                                                    2018), https://web.archive.org/web/20180314234926/https://crserve.com/#testimonials (last visited June 24, 2025).

[27] Wisconsin Public Radio, *Lac du Flambeau tribal leaders and lenders reach deal in class-action lawsuit*, https://www.wpr.org/news/lac-du-flambeau-tribal-leaders-and-lenders-reach-deal-in-class-action-lawsuit (last visited June 24, 2025).

1  cancellation of about **$1.4 billion** in debt from outstanding loans.[28] In 2018, LDF

2  Holdings stated that "[i]t [was] an absolute honor to partner with CreditServe."[29]

3  This testimonial no longer appears on the CreditServe website.[30]

4       51.    The CreditServe Defendants have also been accused of being the non-

5  tribal schemers behind Minto Money, a tribal lending enterprise associated with the

6  Native Village of Minto, a federally recognized tribe in Alaska.

7       52.    In fact, the CreditServe Defendants have been sued repeatedly over

8  allegations of their involvement in Minto Money. For example, in November 2024,

9  a class action lawsuit filed in federal court in Illinois alleged that the CreditServe

10 Defendants "are the de facto owners" of Minto Money and "control the enterprise."

11 *Scales et al v. McGraw et al*, No. 1:24-CV-11575 (N.D. Ill. Nov. 11, 2024), ECF

12 No. 1, ¶ 95. The complaint further alleged that McGraw, in particular, "has provided

13 tens of millions of dollars of capital to fund the loans made in the name of Minto

14 Money" and that all three of the CreditServe Defendants "have collected hundreds

15 of millions of dollars of payments made by consumers like Plaintiffs on Minto

16 Money loans." *Id.* ¶¶ 108, 119.

17  **E.    The Tribe Launches Multiple Online Lending Businesses in Quick**

18       **Succession**

19       53.    The Crow Creek Sioux reservation (the "Reservation"), which is home

20 to about 2,000 people, is located in parts of Buffalo, Hughes, and Hyde counties on

---

[28] *Id.*

[29] CreditServe, *supra* n.26.

[30] In 2018, the CreditServe website included only one other testimonial, from "Zero Parallel," an online lead aggregator. CreditServe, *supra* n.26. In 2017, the CFPB took action against Zero Parallel after finding that the company had "sold consumers' payday and installment loan applications to lenders it knew were likely to make void loans that the lenders had no legal right to collect." CFPB, *Zero Parallel, LLC*, https://www.consumerfinance.gov/enforcement/actions/zero-parallel-llc/ (last visited June 24, 2025).

1    the east bank of the Missouri River in central South Dakota.[31]

2    54.    Nearly 33% of the Reservation's residents live in poverty, compared

3    to less than 12% of residents in South Dakota.[32] The median household income of

4    $46,750 is far below the state's median household income of $72,421.[33]

5    55.    In October and November 2020, the Tribe passed resolutions to

6    establish the Dakota Economic Development Corporation established. Ex. B.

7    DEDC claims to be the "economic arm" of the Tribe.[34] Per the Tribe's Charter, the

8    DEDC Board of Directors (the "DEDC Board") is authorized "to establish any

9    subsidiary organization as may be appropriate to its business" and "to take such

10    further actions as are necessary to carry out the purposes as described by the

11    Charter, and applicable tribal and federal law." Ex. B.

12    56.    Soon thereafter, River Valley Loans launched. On February 16, 2021,

13    the DEDC Board authorized and approved the charter of Wahido Lending, "for the

14    purpose of creating an arm and entity of the Tribe to foster economic development

15    for the Tribe and its members." Ex. C (the "Wahido Charter"). Regarding Wahido

16    Lending, the Wahido Charter grants to the DEDC Board the broad powers to,

17    among others, "enter into contracts with any person, partnership, or Corporation"

18    and "take such further actions as are necessary to carry out the purposes" of the

19    Wahido Charter. *Id*.

20

---

21    [31] Húŋkpati Oyáte, https://hunkpatioyate.org/ (last visited June 24, 2025); United

22    States Census Bureau, *Crow Creek Reservation, SD*,

23    https://data.census.gov/profile/Crow_Creek_Reservation_SD?g=2500000US0855 (last visited June 24, 2025).

24    [32] *Id.*; United States Census Bureau, *QuickFacts South Dakota*,

25    https://www.census.gov/quickfacts/fact/table/SD/BZA210222 (last visited June 24, 2025).

26    [33] *Id.*; United States Census Bureau, *infra* n.32; United States Census Bureau.

27    [34] Dakota Economic Development Corporation Crow Creek Sioux Tribe, https://dakotaeconomic.com/ (last visited June 24, 2025).

57.    According to the River Valley Loans website, "Wahido Lending dba River Valley Loans is a wholly owned subsidiary of Dakota Economic Corporation ('DEDC'), a sovereign economic arm, enterprise, and instrumentality of, and created under the laws of and for the benefit of, the Crow Creek Sioux Tribe…"[35]

58.    River Valley Loans' original "certificate of licensure," dated September 7, 2021, is signed by Thin Elk.[36] According to the license, Mr. Thin Elk is the sole "Commissioner" of the "Crow Creek Financial Services Licensing & Regulatory Commission" (the "Commission"), and has issued the license "pursuant to and in accordance with the Tribal Credit Code of the Crow Creek Sioux Tribe."[37]

59.    Thin Elk is not a member of the Tribe. Rather, he is an enrolled member of a different Native American tribe located hundreds of miles from South Dakota, and has previously been fired from a tribal job due to his history of violence.[38]

60.    Also in 2021, Bison Lending d/b/a Buffalo Lake Lending ("Bison Lake Lending") launched. According to the Buffalo Lake Lending website, "Bison Lending DBA Buffalo Lake Lending is an economic arm and instrumentality of the Crow Creek Sioux Tribe."[39] Buffalo Lake Lending's "certificate of licensure," dated March 11, 2021, is also signed by Thin Elk, and is substantively identical to

---

[35] River Valley Loans, *supra* n.2.

[36] River Valley Loans, *About River Valley Loans, Tribal Lenders* (digital archive from Wayback Machine, dated March 27, 2023), https://web.archive.org/web/20230327205954/https://rivervalleyloans.com/about/ (last visited June 24, 2025).

[37] *Id.*

[38] Acee Agoyo, The Sioux Chef under fire for overlooking key employee's violent past, Indianz.com (July 22, 2022), https://indianz.com/News/2022/07/22/the-sioux-chef-under-fire-for-overlooking-key-employees-violent-past/..

[39] Buffalo Lake Lending, https://buffalolakelending.com/ (last visited June 24, 2025).

the RVL license.[40]

61.    Then, in 2023, Inazin Lending d/b/a Rise Up Lending ("Rise Up Lending") launched. Like the River Valley Loans website, according to the Rise Up Lending website, "Inazin Lending dba Rise Up Lending is a wholly owned subsidiary of Dakota Economic Corporation ('DEDC'), a sovereign economic arm, enterprise and instrumentality of, and created under the laws of and for the benefit of, the Crow Creek Sioux Tribe…"[41] Rise Up Lending's "certificate of licensure," dated September 12, 2023, is also signed by Thin Elk, and is also largely identical to the licenses of Bison Lake Lending and River Valley Loans.[42]

62.    In addition to the foregoing lending businesses, the Tribe has also claimed to be behind two others: Basswood Lending, d/b/a Level Up Funding[43] and Koda Lending, DBA Helpful Lending.[44]

63.    The lender in Plaintiff's case was River Valley Loans, which issues loans with annual percentage rates that often exceed 700%.

64.    River Valley Loans claims that it can lawfully charge such eye-popping interest rates because the Tribe enjoys sovereign immunity.

65.    In other words, because DEDC—and the Tribe, more broadly—

---

[40] Buffalo Lake Lending, *Certificate of Licensure Financial Services Company* (digital archive from Wayback Machine, dated July 6, 2022), https://web.archive.org/web/20220706011716/https://buffalolakelending.com/theme/buffalolakelendingLicense.pdf (last visited June 24, 2025).

[41] Rise Up Lending, https://riseuplending.com/ (last visited June 24, 2025).

[42] Rise Up Lending, *About Rise Up Lending*, https://riseuplending.com/about/ (last visited June 24, 2025).

[43] Level Up Funding (digital archive from Wayback Machine, dated March 16, 2025), https://web.archive.org/web/20250316064146/https://www.levelupfunding.com/index.aspx (last visited June 24, 2025).

[44] Helpful Lending (digital archive from Wayback Machine, dated Apr. 19, 2025), https://web.archive.org/web/20250419174156/https://www.helpfullending.net/index.aspx (last visited June 24, 2025).

supposedly control River Valley Loans, there is no limit whatsoever to the interest rates that can be charged on RVL loans.

**F.    The Tribe's Limited Role in River Valley Loans**

66.    There are several indications that the Tribe is not as involved in the RVL enterprise as it claims.

67.    For instance, the Tribe makes no mention whatsoever of River Valley Loans, or *any* of the Tribe's other supposed lending entities, on its website.[45] Nor does the Tribe mention the Commission, Thin Elk, or even the Tribe's supposed "Tribal Credit Code."

68.    The DEDC website likewise does not discuss River Valley Loans, the Commission, Thin Elk, nor the Tribe's Tribal Credit Code. The only mention of the Tribe's lending activities comes in a meager response to the FAQ, "Can I get a loan?" DEDC responds that, "Though DEDC is the Parent Company to Tribal Lending Entities none of these TLE's lend in South Dakota as well as a handful of other states"[46]

69.    The Wahido Charter also does not reference the Commission, or even the Tribe's purported Tribal Credit Code.

**G.    The CreditServe Defendants are the De Facto Owners and Managers of RVL, While Thin Elk Provides Credibility to the Entire Scheme**

70.    Beyond surface-level claims of the Tribe's involvement, there are few demonstrable connections between the Tribe and RVL. At the same time, there *are* numerous ties between River Valley Loans and CreditServe, including several that demonstrate that the CreditServe Defendants, not the Tribe, are in control of the

---

[45] *See generally*, Húŋkpati Oyáte, *infra* n.31.

[46] Dakota Economic Development Corporation, *Frequently asked questions*, https://dakotaeconomic.com/faq (last visited June 24, 2025).

1  RVL operation. Meanwhile, Thin Elk lends credence to the scheme by issuing the

2  sham "certificate of licensure" that is prominently displayed on the RVL website.

3      71.    Indeed, CreditServe and Welch have already been sued—at least three

4  times, in September 2023, August 2024, and March 2025—on a class action basis

5  over allegations that they are the masterminds behind River Valley Loans. *See*

6  *generally*, *Rehfeldt v. Wahido Lending et al*, No. 1:23-CV-01756 (S.D. Ind.);

7  *Trawick v. Wahido Lending et al*, No. 1:24-CV-01334 (S.D. Ind.); *Horatschki v.*

8  *Wahido Lending et al*, No. 1:25-CV-00523 (S.D. Ind.).

9      72.    The first two of these matters settled privately and were dismissed

10  before the commencement of discovery. Several other individual lawsuits have

11  similarly alleged that the Tribe has little involvement with the operations of River

12  Valley Loans and, instead, that CreditServe is behind RVL.

13      73.    Moreover, in 2025, when a number of consumers who borrowed from

14  River Valley Loans (including Plaintiff) contacted the lender via email, they

15  received responses from River Valley Loans representatives named Donnie and/or

16  Juanita. But there is no one with these names on staff at DEDC, the tribal entity that

17  purportedly operates River Valley Loans. On the other hand, CreditServe—which

18  has only approximately 100 employees—*does* have employees named both

19  Juanita[47] and Donnie.[48]

20      74.    In addition, the DEDC office is open Monday through Friday, 8 a.m.

21  to 4:30 p.m., and is closed on the weekends.[49] However, the River Valley Loans

22  "customer care" team is available "Monday through Friday, 7AM to 7PM and

23

24  _____

25  [47]  LinkedIn, *Juanita George-Huguley*, https://www.linkedin.com/in/juanita-george-huguley-0b3953148/ (last visited June 24, 2025).

26  [48]  LinkedIn, *Donnie Rogers*, https://www.linkedin.com/in/donnie-rogers-791b2915b/ (last visited June 24, 2025).

27

Saturday 8AM to 4:30PM Central Time."[50] What's more, the former CreditServe Collections Specialist discussed above claimed that part of their job was "to make sure every email was done between 7:00 AM to 7:00 PM"[51]—the exact same weekday hours that the River Valley Loans "customer care" team is available.

75.     The strongest indication that the CreditServe Defendants control River Valley Loans comes via Minto Money—another tribal lender "run" by a different tribe that is (supposedly) based more than 3,000 miles away from the Reservation. There are striking similarities between RVL and Minto Money, confirming that the same non-tribal actors—the Credit Serve Defendants—are behind both enterprises.

76.     For example, the navigation bars of the two lenders' websites are exactly the same. *See* Ex. D.

77.     The "Home" page of each website also includes several identical features, including examples of the "emergency expenses" that the lender's loans can help cover. *See* Ex. E.

78.     The content of the "Contact" pages for the two websites is also nearly identical. *See* Ex. F.

79.     Likewise, the content of the "Best Lending Practices" pages of the two websites are strikingly similar. *See* Ex. G.

80.     The same is true of numerous other pages across the two sites, including the "Availability & Rates" pages (*compare* https://mintomoney.com/availability-and-rates/ *with* https://rivervalleyloans.com/availability-and-rates/), and the "About" pages (*compare* https://mintomoney.com/about/ *with* https://rivervalleyloans.com/about/), among others.

---

[50]     River Valley Loans, *Contact Customer Care*, https://rivervalleyloans.com/contact/ (last visited June 24, 2025).
[51] LinkedIn, *supra* n.19.

81.    The "IMPORTANT DISCLOSURES" contained in the footer of each website are also largely identical. *See* Ex. H.

82.    Further, the back-ends of the websites, including the portal for new and existing borrowers, are also the same. *See* Ex. I.

83.    And both the Minto Money and River Valley Loans websites use the same SSL certificate management company, Sectigo Limited.

84.    They also use the same company—Viking Client Services, LLC, d/b/a Viking Business Services, for which Welch has provided a client testimonial on behalf of CreditServe—to process payments.

85.    Lastly, Thin Elk, who serves as the Commissioner of the RVL Commission, *also* serves as the "Commissioner" of the "Minto Financial Services Licensing & Regulatory Commission." The purported tribal "licenses" of both entities contain the same verbiage, formatting, and signature. *See* Ex. J.

86.    These many, many similarities—between two lenders that purport to be owned and operated by different tribes that are thousands of miles apart—are not a coincidence. The reason they are identical is that the CreditServe Defendants are controlling both lending operations.

## H.    The CreditServe Defendants Operate All Substantive Aspects of RVL, Thus Issuing Usurious Loans

87.    The Tribe does not meaningfully participate in the day-to-day lending operations of River Valley Loans. Rather, the CreditServe Defendants, and other non-tribal schemers to be uncovered in discovery, exercise control of the illegal lending enterprise by operating all substantive aspects of the business, including the funding, marketing, loan origination, underwriting, loan servicing, electronic funds transfers, and collections of the illegal loans.

88.    The majority of the profits made by River Valley Loans did not and do not flow to the Tribe. Instead, discovery will show that the vast majority of the

1    profits flow to non-tribal outsiders, including the Non-Tribal Defendants.

2        89.    River Valley Loans is not licensed to lend in the states in which it is

3    lending, and it is lending at interest rates that are illegal in many states. The only

4    license that River Valley Loans purports to have is the one, signed by Thin Elk, that

5    was issued by the Tribe's purported Commission.[52]

6        90.    Under the terms of RVL's loan agreements, Defendants lent borrowers

7    small sums of money and charged annual interest rates in the high triple digits—

8    rates often exceeding 700%. As a result of these exorbitant finance charges, Plaintiff

9    and others have ended up owing, and paying, many times the amount of money that

10    they initially borrowed.

11        91.    The interest rates that Defendants charged under these loan agreements

12    are many times the caps imposed by state law in a number of jurisdictions, including

13    the state in which Plaintiff resides.

14    **I.    Plaintiff's Loan with River Valley Loans**

15        92.    From his residence in San Diego, California, Plaintiff applied for and

16    took out a loan with River Valley Loans over the internet in May 2024.

17        93.    Plaintiff's loan from River Valley Loans was for $600 and had an

18    interest rate of 494.76%. According to the loan agreement, the finance charges on

19    the loan were $4,007.95. Absent the final payment, the monthly payment on the

20    loan was $288.05. If Plaintiff had made all of the payments on his loan according

21    to the payment schedule, he would have ended up paying Defendants $4,607.95 for

22    his $600 loan—more than **seven times** what he borrowed. Plaintiff paid $2,016.35

23    for this loan—more than **three times** what he borrowed—before he ceased making

24    payments once he learned that his loan from River Valley Loans was usurious.

25

26     

27    [52]  River Valley Loans, *About River Valley Loans, Tribal Lenders*, https://rivervalleyloans.com/about/ (last visited June 24, 2025).

94.    The State of California sets the maximum allowable interest rate on a consumer loan at 10%. Cal. Const. Art. XV § 1.

95.    Defendants' loan to Plaintiff and those to other California residents all carried interest rates that were many times California's 10% interest rate cap.

96.    California's Unfair Competition Law ("UCL") prohibits unfair or deceptive business practices. Cal. Bus. & Prof. Code § 17200.

97.    Defendants unlawfully lent money to Plaintiff and other California residents through illegal loans marred by usurious interest, and thus violated the UCL.

## CLASS ACTION ALLEGATIONS

98.    Plaintiff asserts claims on behalf of the proposed National Class defined as follows:

> All United States residents who entered into loan agreements with River Valley Loans within the applicable statute of limitations. This Class does not include loans that were taken out while a consumer was located in Utah or Nevada.

99.    Plaintiff asserts claims on behalf of the proposed California Class defined as follows:

> All California residents who entered into loan agreements with River Valley Loans within the applicable statute of limitations.

**A.    Numerosity**

100.    There are hundreds or thousands of members of the Classes. Thus, the Classes are so numerous that joinder of all members is impracticable.

**B.    Commonality**

101.    There are numerous common questions of law and fact common to Plaintiff and the members of the Classes. These questions include, but are not limited to, the following:

1      a.     Whether Defendants violated state usury and consumer protection

2  laws;

3      b.     Whether Defendants are protected by tribal sovereign immunity;

4      c.     Whether Defendants engaged in unfair or deceptive acts or practices;

5      d.     Whether Defendants constitute an "enterprise" under RICO;

6      e.     Whether Defendants violated RICO by charging interest rates more

7  than the twice the legal limit under state law;

8      f.     The scope of any prospective relief; and

9      g.     The proper measure and amount of damages for the Classes.

**C.    Typicality**

102.    Plaintiff's claims are typical of the claims of the Classes he seeks to represent. Plaintiff, like members of the Classes, took out usurious loans from Defendants. Thus, Plaintiff's claims, like the claims of the Classes, arise out of the same common practices and conduct by Defendants and are based on the same legal and remedial theories.

**D.    Adequacy**

103.    Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff has competent and capable attorneys who are experienced trial lawyers with significant experience litigating complex class actions, including experience litigating tribal lending cases. Plaintiff and his counsel are committed to prosecuting this action vigorously on behalf of the Classes and have the financial resources to do so. Neither Plaintiff nor his counsel have interests that conflict with those of the Classes.

**E.    Injunctive Relief**

104.    The Classes meet the requirements for certification to obtain injunctive or equitable relief under Fed. R. Civ. P. 23(b)(2), as Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making

appropriate final injunctive or equitable relief with respect to the Classes as a whole. Prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications with respect to individual members of the Classes that would establish incompatible standards of conduct for Defendants.

**F.    Predominance and Superiority**

105.   The Classes meet the requirements for certification to seek monetary relief under Federal Rule of Civil Procedure 23(b)(3), as the questions of law or fact common to class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Additionally, individual actions may be dispositive of the interests of members of the Classes even though certain members of the Classes are not parties to such actions. Further, a class action is superior to other available methods for the fair and efficient adjudication of the controversy for at least the following reasons:

a.    Absent a class action, as a practical matter, members of the Classes will be unable to obtain redress, Defendants' violations will continue without remedy, and additional consumers will be harmed.

b.    It would be a substantial hardship for most individual members of the Classes if they were forced to prosecute individual actions.

c.    A class action will permit an orderly and expeditious administration of class claims and foster economies of time, effort, and expense.

d.    The lawsuit presents no difficulties that would impede its management by the Court as a class action.

e.    Defendants have acted on grounds generally applicable to class members, making class-wide relief appropriate.

## CAUSES OF ACTION

**FIRST CAUSE OF ACTION**

**Violation of RICO, 18 U.S.C. § 1962(c)**

**(On Behalf of Plaintiff and the National Class)**

**(Class Claims against the Non-Tribal Defendants)**

106.   Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

107.   Each Non-Tribal Defendant is a "person" as that term is defined in 18 U.S.C. § 1964(3).

108.   The Enterprise, consisting of each of the named CreditServe Defendants, Thin Elk, the Tribal Defendants, RVL, DEDC, and the unnamed officers, executives, and other employees of CreditServe and other companies involved in the scheme, is in association as an "enterprise" as that term is defined in 18 U.S.C. § 1961(4). The Enterprise associated for the common purpose of profiting off of the collection on unlawful debt by offering and collecting on loans to consumers throughout the United States.

109.   The Enterprise had an ongoing organization with an ascertainable structure, and functioned as a continuing unit with separate roles and responsibilities.

110.   The Non-Tribal Defendants violated § 1962(c) of RICO by participating, directly or indirectly, in the conduct of the Enterprise's affairs in the collection of unlawful debt.

111.   RICO defines "unlawful debt" as a debt which was "unenforceable under State law in whole or in part as to principal or interest because of the laws relating to usury," and was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

112.   All of the loans made to the National Class members and collected by

the Non-Tribal Defendants included an interest rate far in excess of twice the enforceable rate in National Class members' respective states.

113.  The Non-Tribal Defendants charged Plaintiff interest rates in excess of the maximum rate allowed in his state knowingly, deliberately, intentionally, and willfully, with the purpose of taking more than twice the legal rate of interest for the money loaned to Plaintiff.

114.  The Non-Tribal Defendants' conduct was not the result of good-faith error, but instead was a knowing, deliberate, intentional, and willful scheme to circumvent laws in Plaintiff's state, and to collect interest at rates more than twice that allowed under that state's laws.

115.  Plaintiff and the National Class members were injured as a result of the Non-Tribal Defendants' violations of 18 U.S.C. § 1962(c) by, among other things, the payment of unlawful and usurious rates of interest on loans made by the Enterprise.

116.  This conduct continues to date, and will be repeated again and again in the future, to the detriment of consumers.

117.  Accordingly, the Non-Tribal Defendants are jointly and severally liable to Plaintiff and National Class members for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## SECOND CAUSE OF ACTION

### Violation of RICO, 18 U.S.C. § 1962(d)

### (On Behalf of Plaintiff and the National Class)

### (Class Claims against the Non-Tribal Defendants)

118.  Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

119.  Each Non-Tribal Defendant is a "person" as that term is defined in 18 U.S.C. § 1964(3).

120.  The Enterprise, consisting of each of the named CreditServe Defendants, Thin Elk, the Tribal Defendants, RVL, DEDC, and the unnamed officers, executives, and other employees of CreditServe and other companies involved in the scheme, is in association as an "enterprise" as that term is defined in 18 U.S.C. § 1961(4). The Enterprise associated for the common purpose of profiting off of the collection on unlawful debt by offering and collecting on loans to consumers throughout the United States through online lenders affiliated with the Non-Tribal Defendants.

121.  The Enterprise had an ongoing organization with an ascertainable structure, and functioned as a continuing unit with separate roles and responsibilities.

122.  The Non-Tribal Defendants violated 18 U.S.C. § 1962(d) by conspiring to use the Enterprise to collect unlawful debt. Each of the Non-Tribal Defendants knowingly agreed to participate in the scheme alleged herein that allowed the Enterprise to make and collect unlawful debt at more than twice the lawful rate of interest under state usury laws.

123.  This conduct continues to date, and will be repeated again and again in the future, to the detriment of consumers.

124.  Accordingly, the Non-Tribal Defendants are jointly and severally liable to Plaintiff and the National Class members for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## THIRD CAUSE OF ACTION

### Violations of California's Usury Law

### (On Behalf of Plaintiff and the California Class)

### (Class Claims against the Non-Tribal Defendants)

125.  Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

1    126.   Under the California Constitution, the maximum allowable interest

2    rate on a consumer loan is 10% per annum. Cal. Const. Art. XV § 1.

3    127.   As alleged above, the loans taken out by Plaintiff and California Class

4    members were usurious and each carried an annual interest rate well in excess of

5    10%.

6    128.   Accordingly, Plaintiff and members of the California Class are entitled

7    to recover all interest paid on the loans in excess of 10%, plus treble damages for

8    any interest paid within the year preceding the filing of this action and their

9    attorneys' fees and costs. Cal. Civ. Code § 1916-3.

10    **FOURTH CAUSE OF ACTION**

11    **Violations of Cal. Bus. & Prof. Code § 17200**

12    **(On Behalf of Plaintiff and the California Class)**

13    **(Class Claims against the Non-Tribal Defendants)**

14    129.   Plaintiff realleges and incorporates by reference each and every

15    allegation set forth in the preceding paragraphs.

16    130.   As alleged above, the Non-Tribal Defendants engaged in unlawful

17    and/or unfair business practices through the sham relationship with the Tribe in

18    order to make high-interest loans to consumers throughout the country, including

19    in California. The Non-Tribal Defendants' unlawful and/or unfair acts include the

20    following:

21    a.    Attempting to avoid application of California usury law by

22    improperly using tribal sovereign immunity as a shield for their activities;

23    b.    Charging interest rates that are well in excess of the rates

24    allowed by law and demanding or collecting payment of this excessive interest.

25    131.   The Non-Tribal Defendants' unlawful, fraudulent, and/or unfair acts

26    and practices have occurred in trade or commerce.

27

132.   The Non-Tribal Defendants' acts and practices are unfair because they: (i) cause substantial financial injury to Plaintiff and members of the California Class; (ii) are not outweighed by any countervailing benefits to consumers or competitors; and (iii) are not reasonably avoidable by consumers. The Non-Tribal Defendants' acts and practices are also unfair because they are immoral, unethical, oppressive and unscrupulous.

133.   The Non-Tribal Defendants' unfair acts or practices have impacted the public interest because they have injured Plaintiff and thousands of California residents by charging them interest in excess of the amount allowed by law. The Non-Tribal Defendants acted unfairly by representing or implying that they could legally charge interest rates of 700% or more because the Non-Tribal Defendants claim that River Valley Loans is a tribal entity not subject to state law.

134.   As a direct and proximate result of the Non-Tribal Defendants' unlawful and/or unfair acts and practices, Plaintiff and the California Class have been injured in their money or property. By charging and collecting interest that they were not legally entitled to charge or collect, the Non-Tribal Defendants have injured the property of Plaintiff and the other members of the California Class.

135.   The Non-Tribal Defendants' wrongdoing is continuing in nature and represents an ongoing threat to Plaintiff and California Class members, particularly since the Non-Tribal Defendants continue to represent that they are lawfully entitled to make loans exceeding California's usury cap, continue to make loans to California residents at usurious interest rates, and continue to collect unlawful interest on usurious loans already made to California residents. Thus, Plaintiff and California Class members will suffer continuing, immediate, and irreparable injury absent the issuance of injunctive and equitable relief.

136.   Accordingly, Plaintiff and California Class members are entitled to recover all interest paid on the loans in excess of 10%, as well as to obtain an

1   injunction prohibiting any future collection of the loans. Cal. Bus. & Prof. Code §
2   17203.

### FIFTH CAUSE OF ACTION

**Unjust Enrichment**

**(On Behalf of Plaintiff and the National Class)**

**(Class Claims against the Non-Tribal Defendants)**

**(Alleged in the Alternative)**

8   137.   Plaintiff realleges and incorporates by reference each and every
9   allegation set forth in the preceding paragraphs.

10   138.   To the detriment of Plaintiff and National Class members, the Non-
11   Tribal Defendants have been, and continue to be, unjustly enriched as a result of
12   charging and collecting illegal, usurious interest rates.

13   139.   As between the parties, it would be unjust for the Non-Tribal
14   Defendants to retain the benefits attained by their actions. Accordingly, Plaintiff
15   seeks a full accounting and restitution of the Non-Tribal Defendants' enrichment,
16   benefits, and ill-gotten gains acquired as a result of the unlawful conduct alleged
17   herein.

### SIXTH CAUSE OF ACTION

**Civil Conspiracy**

**(On Behalf of Plaintiff and the National Class)**

**(Class Claims against the Non-Tribal Defendants)**

22   140.   Plaintiff realleges and incorporates by reference each and every
23   allegation set forth in the preceding paragraphs.

24   141.   All of the loans that the Non-Tribal Defendants made to consumers in
25   the name of River Valley Loans violated Plaintiff's and the National Class
26   members' respective states' interest rates and lending laws.

27   142.   The Non-Tribal Defendants conspired amongst themselves and with

1   other actors to violate state usury and lending laws and profit from those violations.

2       143.   Accordingly, on behalf of himself and the members of the National

3   Class, Plaintiff seeks to recover from the Non-Tribal Defendants, jointly and

4   severally, all amounts repaid on any loans with the Non-Tribal Defendants.

### SEVENTH CAUSE OF ACTION

**Declaratory Judgment, 28 U.S.C. § 2201**

**(On Behalf of Plaintiff and the California Class)**

**(Class Claims against Tribal Defendants in their official capacities)**

9       144.   Plaintiff realleges and incorporates by reference each and every

10   allegation set forth in the preceding paragraphs.

11      145.   California—along with many other states—requires that those who

12   engage in the business of making small loans be licensed.

13      146.   Defendants were not licensed to make loans in California or any other

14   state.

15      147.   Because Defendants' loans were made without the required license

16   and/or charged excessive interest rates, those loans are void in California.

17      148.   In addition to violating state licensing laws, Defendants' loans also

18   violated the general usury laws of many states, including California.

19      149.   Further, the lending agreements used for Plaintiff's and California

20   Class members' loans contained unconscionable choice-of-law and forum-selection

21   provisions that are void and unenforceable.

22      150.   Because of the triple-digit interest rates, Plaintiff and certain California

23   Class members with unpaid balances are subject to significant liability as the

24   interest accrues on their unpaid debts.

25      151.   Resolution of the validity and enforceability of the outstanding balance

26   on Plaintiff's loan agreement by this Court will determine the rights and interests

27   of the parties to their respective agreements.

1    152.   Thus, the validity and enforceability of Plaintiff's loan agreement,

2  including, but not limited to, any outstanding balance, presents a substantial, non-

3  speculative controversy between parties with adverse legal interests of sufficient

4  immediacy and reality.

5    153.   Accordingly, Plaintiff, on behalf of himself and the members of the

6  California Class, seeks a determination that his loans and those of the California

7  Class members are void and unenforceable, and that Plaintiff and the California

8  Class members are not obligated to pay any principal and/or interest outstanding on

9  the illegal loans under their respective state laws.

### EIGHTH CAUSE OF ACTION

**Injunctive Relief for Violations of State Law**

**(On Behalf of Plaintiff and the California Class)**

**(Class Claims against the Tribal Defendants in their official capacities for prospective relief)**

15    154.   Plaintiff realleges and incorporates by reference each and every

16  allegation set forth in the preceding paragraphs.

17    155.   As alleged herein, Plaintiff and other consumers in California applied

18  for and took out loans with River Valley Loans, which the consumers maintain are

19  void and unenforceable because the loans violate state laws.

20    156.   Plaintiff and members of the California Class have outstanding

21  balances on their loans with River Valley Loans.

22    157.   Because of the usurious interest rates charged by River Valley Loans,

23  Plaintiff and other consumers in California are subject to significant liability as the

24  interest accrues on their unpaid debts.

25    158.   Accordingly, Plaintiff, on behalf of himself and the California Class,

26  seeks injunctive relief from the Tribal Defendants, including, but not limited to, an

27  order: (i) prohibiting the Tribal Defendants from continuing to make or collect on

the illegal loans in California; (ii) requiring the Tribal Defendants to send notices to California consumers explaining that their loans are illegal and usurious; and (iii) prohibiting the Tribal Defendants from selling the unlawful loans to consumers in California to third-party debt collectors.

159.    Plaintiff, on behalf of himself and all others similarly situated, further seeks a determination that he and the California Class members are not obligated to pay any principal and/or interest outstanding on the illegal loans.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief as follows:

A.    An Order certifying the proposed Classes under Fed. R. Civ. P. 23(b)(2) and (b)(3), and appointing Plaintiff as Class Representative and his counsel as Class Counsel;

B.    An Order declaring that Defendants are financially responsible for notifying members of the Classes of the pendency of this suit;

C.    An Order declaring that Defendants have committed the violations of law alleged herein;

D.    An Order providing for any and all injunctive relief the Court deems appropriate;

E.    An Order awarding monetary damages, including, but not limited to, any compensatory, incidental, or consequential damages in an amount to be determined by the Court or jury;

F.    An Order awarding treble damages in accordance with proof and in an amount consistent with applicable precedent;

G.    An Order awarding interest at the maximum allowable legal rate on the foregoing sums;

H.    An Order awarding Plaintiff his reasonable costs and expenses of suit, including attorneys' fees; and

1    I.    Such further relief as this Court may deem just and proper.

2                    **DEMAND FOR JURY TRIAL**

3    Plaintiff respectfully demands a trial by jury pursuant to Fed. R. Civ. P. 38(b).

4    Dated: July 3, 2025                    Respectfully submitted,

5

6                                          /s/Marika K. O'Connor Grant
                                           Marika K. O'Connor Grant, SBN 334469
7                                          John G. Albanese*
                                           Ariana B. Kiener*
8                                          **BERGER MONTAGUE PC**
9                                          1229 Tyler Street NE, Suite 205
                                           Minneapolis, MN 55413
10                                         Tel : (612) 594-5999
11                                         Fax : (612) 584-4470
                                           jalbanese@bm.net
12                                         moconnorgrant@bm.net
13                                         akiener@bm.net
                                           *to be admitted *pro hac vice*
14
15                                         *Attorneys for Plaintiff*

16

17

18

19

20

21

22

23

24

25

26

27

CLASS ACTION COMPLAINT - 34